IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| MARY K. RYAN and ROBERT E. CUSHMAN III, <br><br> Plaintiffs, <br><br> v. <br><br> NAVY FEDERAL CREDIT UNION, <br><br> Defendant. | Civil Action No. _____ |

# COMPLAINT

1. Plaintiffs Mary K. Ryan and Robert E. Cushman III allege as follows for their Complaint against Navy Federal Credit Union ("NFCU").

## PRELIMINARY STATEMENT

2. Congress enacted the Electronic Fund Transfer Act ("EFTA") as a "remedial consumer protection statute," which courts "read liberally to achieve the goals of protecting consumers." *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 239 (4th Cir. 2019).

3. Concerned that uninformed consumers would encounter abuse in a rapidly changing electronic banking industry, Congress enacted several provisions to limit consumer liability for "unauthorized" electronic fund transfers.

4. Relevant here, the EFTA: (1) limits consumer liability for unauthorized electronic fund transfers, 15 U.S.C. § 1693g(a); and (2) independently requires that financial institutions timely investigate consumer claims of "error," including unauthorized electronic fund transfers, 15 U.S.C. § 1693f(a).

5. Addressing those provisions, one federal appeals court recently explained that

> the purpose of the [EFTA] is to *benefit consumers, even at the expense of financial institutions*. The EFTA requires financial institutions to investigate and resolve consumer-reported unauthorized electronic fund transfers within a limited time frame. And although consumers can be liable for unauthorized electronic fund transfers involving their accounts, the EFTA limits their liability and places the burden on financial institutions to prove consumer liability.

*Michigan First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 427 (6th Cir. 2024) (emphasis added).

6. To ensure that correct decisions are made, financial institutions also must communicate to consumers—in writing, within three days—an *explanation* of their decisions to deny disputes. 15 U.S.C. § 1693f(d).

7. The EFTA's unauthorized use protections and notice requirements are especially important because banks are rapidly replacing traditional modes of banking with online products.

8. NFCU, for example, promotes its mobile and online banking capabilities by advertising that its members can "manage [their] account anytime, anywhere." Navy Federal Credit Union, *Mobile and Online Banking*, https://www.navyfederal.org/services/mobile-online-banking.html (last visited Sept. 26, 2024) (advertising mobile check deposits, paperless statements, remote transfers, and bill pay).

9. Coupled with technological advancements—such as innovations aimed at making banking easier—these changes have expanded the fraudster's playbook. *See id.* (advertising remote transfer options and mobile check deposits).

10. Indeed, consumer reports of bank fraud to the Federal Trade Commission more than quadrupled between Q1 2019 and Q1 2022. *See* Federal Trade Commission, *Compare Identity Theft Report Types* (Apr. 25, 2024), *available at* https://public.tableau.com/app

/profile/federal.trade.commission/viz/IdentityTheftReports/TheftTypesOverTime (last visited Sept. 26, 2024).

11. Intensifying the already-high risks of electronic money theft, bank fraud sometimes originates within financial institutions. In other words, fraudsters are sometimes employees of financial institutions or work in tandem with employees of financial institutions. *See, e g.*, CBS 42, *New details in 'slick scam' run against Georgia emerge in what police are calling an 'inside job'* (Jul. 9, 2024), https://www.cbs42.com/regional/georgia-news/new-details-in-slick-scam-run-against-navy-federal-credit-union-emerge-in-what-police-are-calling-an-inside-job ("He was an employee of the Navy Federal Credit Union, so he used his position at that bank and his ability to log in to people's accounts, to manipulate those accounts and move money and deposit checks and withdraw funds.").

12. Plaintiffs are recent victims of bank fraud.

13. In October 2023, Plaintiffs were victimized by several unauthorized electronic fund transfers made from their joint NFCU checking account.

14. Plaintiffs did not authorize or benefit from those transactions, which were performed almost exclusively via hundreds of separate debits to external Cash App accounts purporting to belong to "justin," "tammy," "alexander," and lemandy."

15. The Cash App debit amounts ranged from $1.00 to $345.85, with most transactions falling between $5.00 to $10.00.

16. In addition to the Cash App debits, $1,300 was stolen from Plaintiffs' checking account via debits of $550 and $750 to an unknown Square merchant identified on Plaintiffs' account statement as "get Shocked."

17. Finally, $776.18 was stolen from Plaintiffs' checking account via an unauthorized debit paid to Verizon.

18. In total, $8,145.99 was stolen from Plaintiffs' NFCU checking account, depleting Plaintiffs' account balance to just twenty-two cents.

19. Immediately upon discovering the unauthorized transactions, Plaintiffs reported the fraud to NFCU at its Williamsburg, Virginia branch.

20. Upon information and belief, NFCU failed to investigate (or, alternatively, failed to reasonably investigate) Plaintiffs' disputes.

21. NFCU did not provide Plaintiffs with provisional credits for the unauthorized transactions, and Plaintiffs were forced to eat the substantial losses that they had suffered.

22. Upon information and belief, NFCU did not mail Plaintiffs a written response until February 8, 2024.

23. That response stated in relevant part: "After investigating your claim, we found that no billing error occurred. Our investigation was based on a review of your account activity, including but not limited to: transaction details, account history, and/or discrepancies between the fraud claim and your account."

24. Consequently, Plaintiffs were unable to discern NFCU's basis for holding them responsible for thousands of dollars in losses that were plainly caused by fraud.

25. Unable to rectify the situation with NFCU, Plaintiffs—who live in an extended stay hotel on severely limited income—were unable to afford basic necessities such as their rent, food, and utilities.

26. NFCU's conduct violated 15 U.S.C. § 1693g because NFCU held Plaintiffs liable for unauthorized transfers that they did not perform and from which they did not benefit.

27. NFCU also violated 15 U.S.C. § 1693f(a) because NFCU failed to investigate Plaintiffs' disputes or, alternatively, failed to reasonably investigate Plaintiffs' disputes.

28. Finally, NFCU violated 15 U.S.C. § 1693f(d) because it failed to deliver to Plaintiffs an *explanation* of its determination that the disputed transfers were authorized.

29. NFCU's EFTA violations entitle Plaintiffs to their actual damages, statutory damages, attorneys' fees, and costs. *See* 15 U.S.C. § 1693m.

30. Additionally, Plaintiffs are entitled to treble damages because NFCU knowingly and willfully concluded that their account was not in error when such conclusion could not reasonably have been drawn from the evidence available to NFCU at the time of its investigation. 15 U.S.C. § 1693f(e)(2). Separately, treble damages are warranted because NFCU failed to provisionally credit Plaintiffs' account within ten days and either: "(A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error." 15 U.S.C. § 1693f(e)(1).

## JURISDICTION AND VENUE

31. This Court has jurisdiction under 28 U.S.C. § 1331.

32. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because Plaintiffs reside in this District and Division, and a substantial part of the events giving rise to Plaintiffs' claims occurred here.

## PARTIES

33. Plaintiffs are natural persons and "consumer[s]" as defined by the EFTA, 15 U.S.C. § 1693a(6).

34. NFCU is a Virginia company with a principal place of business in Vienna. It is a "financial institution" as defined by the EFTA, 15 U.S.C. § 1693a(9).

## FACTS

### *The Unauthorized Transfers and NFCU's "Explanation"*

35. Plaintiffs are sheltered homeless Virginians who, at that time of the events stated in this Complaint, temporarily resided at America's Inn in Williamsburg, Virginia.

36. They now temporarily reside at the Captain John Smith Inn in Williamsburg.

37. Plaintiffs housing options are and have been limited because they cannot afford or qualify for more permanent housing.

38. Plaintiffs' joint income is severely limited, consisting of only Mr. Cushman's Department of Defense retirement income and, when she is able to work, Ms. Ryan's part-time waitressing income.

39. Between October 12 and 19, 2023, Plaintiffs were victimized by several unauthorized electronic fund transfers made from their joint NFCU checking account.

40. Before those transactions, Plaintiffs' account had a balance of almost $11,000.

41. After those transactions, Plaintiffs' account had a balance of twenty-two cents.

42. Plaintiffs did not benefit from any of the unauthorized transactions.

43. To be sure, the unauthorized transactions were performed almost exclusively via hundreds of separate debits to external "Cash App" accounts purporting to belong to "justin," "tammy," "alexander," and lemandy."

44. Plaintiffs do not have Cash App accounts, have never used Cash App for any purpose, and do not know the recipients of the funds.

45. The Cash App debit amounts ranged from $1.00 to $345.85, with most transactions falling between $5.00 to $10.00.

46. Upon information and belief, the fraudsters performed mostly nominal transactions (*e.g.*, transactions below $10.00) to avoid detection by Plaintiffs and NFCU.

6

47. Other unauthorized transactions were performed with a Square merchant identified as "get Shocked LI Gosq.com" (two transactions totaling $1,300) and with Verizon Wireless (one transaction in the amount of $776.18).

48. In total, $8,145.99 was stolen from Plaintiffs' NFCU checking account.

49. Because Verizon unilaterally returned $776.18, the total amount unaccounted for is $7,369.81.

50. Immediately upon discovering the unauthorized transactions on or about October 19, 2023, Plaintiffs reported the fraud to NFCU at its branch at 5226 Monticello Avenue, Williamsburg, Virginia.

51. Plaintiffs alerted NFCU to the unauthorized account activity.

52. NFCU personnel at the Williamsburg branch gave Plaintiffs approximately four pages of fraud forms and told them to detail each transaction that they claimed was fraudulent and return the forms.

53. Because of the tremendous number of fraudulent transactions, NFCU advised Plaintiffs that NFCU would mail them additional forms to account for each and every transaction.

54. Approximately one week later, Plaintiffs received in the mail approximately 30 pages of fraud forms. Not even 30 pages of forms provided Plaintiffs with sufficient space to detail the hundreds of fraudulent transactions.

55. In order to document the hundreds of fraudulent transactions, Plaintiffs were forced to make multiple trips in person to the Williamsburg branch. Each time they did so, Plaintiffs paid for a ride via taxicab or bus.

56. Eventually, Plaintiffs filled out approximately 140 pages of fraud forms detailing the fraudulent transactions and gave them, in person, to NFCU personnel at the Williamsburg branch.

57. Upon information and belief, NFCU failed to investigate Plaintiffs' disputes or, alternatively, failed to reasonably investigate Plaintiffs' disputes.

58. To be sure, any reasonable investigation would have revealed, among other red flags: (i) that Plaintiffs had no history using Cash App; (ii) that the $750 and $550 Square transactions and the $776.18 Verizon transactions occurred at the same time as the Cash App transactions and did not remotely fit the pattern of Plaintiffs' transaction history; (iii) that Plaintiffs' account was used primarily for normal household purchases at in-person merchants like Aldi, CVS, Dollar General, and 7-Eleven; and (iv) that the fraud was carried out over a relatively short period of time via hundreds of individual debits to the same few accounts.

59. Despite obvious indicia of fraud, NFCU did not provide Plaintiffs with provisional credits for the dispute unauthorized transactions.

60. As a consequence, and contrary to the EFTA's core purpose of protecting consumers from fraud—even if at the expense of financial institutions—Plaintiffs were forced to eat the substantial losses that they had suffered.

61. Compounding the harm suffered, Plaintiffs did not receive a written response from NFCU until after February 8, 2024.

62. That response stated in relevant part: "After investigating your claim, we found that no billing error occurred. Our investigation was based on a review of your account activity, including but not limited to: transaction details, account history, and/or discrepancies between the fraud claim and your account."

63. Plaintiffs were devastated by NFCU's response to their disputes and its lack of responsiveness to their plight. Plaintiffs were severely depressed, they felt lost and helpless, they experienced anger, frustration, and terrible stress, leading to difficulties sleeping, severe digestive problems, and loss of weight. They expended a tremendous amount of personal time attempting to dispute that they were responsible for the fraudulent transactions, including taking approximately ten trips to the Williamsburg branch and making numerous phone calls during which they were subjected to long wait times and, ultimately, received no help.

64. Plaintiffs followed all of the instructions that NFCU gave them for disputing the fraudulent transactions, but to no avail. After they received the denial from NFCU, and feeling as though NFCU was ignoring them, Plaintiffs arranged for Brittany Horak, a social worker with the City of Williamsburg Human Services Department, to accompany them to NFCU's Williamsburg branch on February 20, 2024. Despite those efforts, NFCU personnel advised Plaintiffs that their only option was to appeal the decision in writing to the Fraud Department.

65. Plaintiffs again followed NFCU's instructions by mailing an appeal to the NFCU Fraud Department and then, as instructed, they waited seven days and called the phone number to the Fraud Department given to them by NFCU. After a long period of waiting to speak with someone about an appeal, they were given a brief conversation with a representative in which Plaintiffs repeated that their money had been stolen. The NFCU Fraud Department representative, however, summarily denied the appeal on the telephone.

66. As before, Plaintiffs were unable to discern NFCU's basis for holding them responsible for $7,369.81 in losses that they simply could not afford.

67. Unable to rectify the situation with NFCU, Plaintiffs were unable to afford basic necessities such as rent, food, and utilities and had to resort to asking a local church, the

9

Williamsburg Community Chapel, for financial assistance just so they could pay for bare necessities. This experience was extremely upsetting and embarrassing.

### *The Statutory Scheme*

68. The EFTA imposes a $50 cap on consumer liability if the consumer's card or other means of access are used by a fraudster. 15 U.S.C. § 1693g(a)(1).

69. The EFTA's $50 cap on liability is subject to just two exceptions. *See* 15 U.S.C. § 1693g(a); 12 C.F.R. § 1005.6(b).

70. First, the $50 cap is raised to $500 when unauthorized transfers occur due to the loss or theft of an access device, *e.g.*, a debit card, and the consumer fails to notify his bank within two business days of learning that the device has been lost or stolen. 15 U.S.C. § 1693g(a); 12 C.F.R. § 1005.6(b)(2).

71. Second, the $50 cap on a consumer's liability (or the $500 cap if the first exception applies) is lifted if: (1) an unauthorized transfer appears on the monthly statement that banks must send to consumers under 15 U.S.C. § 1693d(c); (2) the consumer fails to report the unauthorized transfer to his bank within 60 days after the statement was sent to the consumer; *and* (3) the bank can establish that unauthorized transfers made after the 60-day period would not have occurred but for the consumer's failure to provide timely notice of the earlier unauthorized transfer. 15 U.S.C. § 1693g(a); 12 C.F.R. § 1005.6(b)(2).

72. In other words, when a consumer fails to alert his bank of unauthorized transfers within 60 days of those transfers first appearing on a bank-issued statement, the consumer's liability is uncapped for transfers that happen after the expiration of the 60-day period. *See* 12 C.F.R. § 1005.6(b)(3). The consumer's liability, however, remains capped at $50 (or $500) for transfers that occurred before or within the 60-day period.

73. Thus, a financial institution can never hold a consumer liable for more than $50 in unauthorized transfers if: (1) the consumer did not lose his debit card or other access device; and (2) the consumer reported all losses within 60 days from when the first statement showing the fraud was transmitted to the consumer. *See Brown v. Bank of Am., N.A.*, No. 8:21-cv-2334, 2022 WL 2193286, at *2 (D. Md. June 17, 2022) ("[S]ection 1693g of the EFTA limits consumer liability to $50.00 for unauthorized electronic fund transfers, provided the consumer alerts the Bank of the unauthorized transfer timely and that transaction is not the result of a lost or stolen access device.").

74. The EFTA also requires that the financial institution investigate any "error" reported by a consumer within ten business days of the financial institution's receipt of notice of such error. *See* 15 U.S.C. § 1693f(a).

75. Alternatively, the financial institution may, within ten business days, provisionally recredit the consumer's account for the alleged error pending the conclusion of its investigation, provided that the investigation is concluded within forty-five days of the receipt of notice of the error. *Id.* at § 1693f(c).

76. If a consumer's dispute is denied, the financial institution must "deliver or mail to the consumer *an explanation of its findings* within 3 business days after the conclusion of its investigation." 15 U.S.C. § 1693f(d) (emphasis added); 12 C.F.R. § 1005.11(d)(1) ("The institution's report of the results of its investigation shall include a written explanation of the institution's findings and shall note the consumer's right to request the documents that the institution relied on in making its determination. Upon request, the institution shall promptly provide copies of the documents.").

77. Although not defined by the EFTA or Regulation E, case law makes clear that "explanation" requires more than just a conclusory statement of the financial institution's findings. *See Gale v. Hyde Park Bank*, 384 F.3d 451, 453 (7th Cir. 2004) (distinguishing between a "determination" and "the results of such investigation"); *In re Bank of Am. California Unemployment Benefits Litig.*, 2023 WL 3668535, at *11 (S.D. Cal. May 25, 2023) ("These allegations plausibly allege that Plaintiffs 'got a determination but not the results of the required investigation or the supporting documentation' and are sufficient to state a claim under the EFTA." (cleaned up)); *see also* Black's Law Dictionary, *Explanation* (11th ed. 2019) ("The activity or process of expounding, interpreting, or making something intelligible; esp., the process of demonstrating by reasoning or investigation the causal or logical antecedents or conditions of some event or thing to be accounted for.").

78. Any violation of the EFTA entitles the consumer to actual damages, statutory damages, costs, and attorneys' fees. 15 U.S.C. § 1693m.

79. Consumers also may recover treble damages in specific circumstances, including when a financial institution knowingly and willfully concludes that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation. 15 U.S.C. § 1693f(e).

**COUNT ONE:**
**VIOLATION OF THE EFTA AND REGULATION E**
**15 U.S.C. §§ 1693g, 1693m, 12 C.F.R. § 1005.6(b)**

80. Plaintiffs incorporate each of the preceding allegations.

81. NFCU violated 15 U.S.C. § 1693g and 12 C.F.R. § 1005.6(b) by holding Plaintiffs liable for unauthorized transfers in excess of the applicable statutorily imposed cap.

82. Because Plaintiffs did not authorize the subject transfers, NFCU cannot meet its burden of establishing that the transfers were, in fact, authorized, as required under the EFTA. *See* 15 U.S.C. § 1693g(b).

83. Plaintiffs suffered actual damages because of NFCU's violations of 15 U.S.C. § 1693g and 12 C.F.R. § 1005.6(b), including but not limited to the amount of the unauthorized transfers, Plaintiffs' inability to access their money, the stress of not having access to their money, and emotional distress.

84. Based on NFCU's noncompliance with 15 U.S.C. § 1693g and 12 C.F.R. § 1005.6(b), Plaintiffs seek actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1693m.

**COUNT TWO:**
**VIOLATION OF THE EFTA AND REGULATION E**
**15 U.S.C. §§ 1693f(a), 1693f(e), 1693m, 12 C.F.R. § 1005.11(c)**

85. Plaintiffs incorporate each of the preceding allegations.

86. NFCU violated 15 U.S.C. § 1693f(a) by failing to investigate Plaintiffs' unauthorized transfer disputes or, alternatively, by failing to reasonably investigate Plaintiffs' unauthorized transfer disputes.

87. Plaintiffs suffered actual damages because of NFCU's violations of 15 U.S.C. § 1693f(a), including but not limited to the amount of the unauthorized transfers, Plaintiffs' inability to access their money, the stress of not having access to their money, and emotional distress.

88. Based on NFCU's noncompliance with 15 U.S.C. § 1693f(a) and 12 C.F.R. § 1005.11(c), Plaintiffs seek actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1693m.

89. Plaintiffs also seek treble damages because: (i) NFCU did not provisionally recredit Plaintiffs' account and did not make a good faith investigation of the alleged error or did not have a reasonable basis for believing that Plaintiffs' account was not in error; and (ii) NFCU knowingly and willfully concluded that Plaintiffs' account was not in error when such conclusion could not reasonably have been drawn from the evidence available to NFCU at the time of its investigation. 15 U.S.C. § 1693f(e).

**COUNT THREE:**
**VIOLATION OF THE EFTA AND REGULATION E**
**(15 U.S.C. §§ 1693f(d), 1693m, 12 C.F.R. § 1005.11(c))**

90. Plaintiffs incorporate each of the preceding allegations.

91. NFCU violated 15 U.S.C. § 1693f(d) by failing to provide Plaintiffs with a sufficient explanation for its decision to deny their disputes.

92. NFCU violated 15 U.S.C. § 1693f(d) by failing to provide Plaintiffs with a timely explanation for its decision to deny their disputes.

93. Consequently, Plaintiffs were deprived of information that would have allowed them to convince NFCU that they did not authorize or benefit from—and thus were not responsible for—the unauthorized transfers.

94. Plaintiffs suffered actual damages because of NFCU's violations of 15 U.S.C. § 1693f(d), including but not limited to the amount of the unauthorized transfers, Plaintiffs' inability to access their money, the stress of not having access to their money, and emotional distress.

95. Based on NFCU's noncompliance with § 1693f(d), Plaintiffs seek actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1693m.

WHEREFORE, Plaintiffs demand judgment for actual, treble, and statutory damages against NFCU; their attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and such other relief the Court considers proper.

**TRIAL BY JURY IS DEMANDED.**

        Respectfully submitted,
        **MARY K. RYAN & ROBERT E. CUSHMAN III**

        By: /s/ Mark C. Leffler
        Leonard A. Bennett, VSB No. 37523
        Mark C. Leffler, VSB No. 40712
        **CONSUMER LITIGATION ASSOCIATES, P.C.**
        763 J Clyde Morris Boulevard, Suite 1A
        Newport News, VA 23601
        Telephone: (757) 930-3660
        Facsimile: (757) 930-3662
        Email: lenbennett@clalegal.com
        Email: mark@clalegal.com

        Kristi C. Kelly, VSB #72791
        Andrew J. Guzzo, VSB #82170
        Casey S. Nash, VSB #84261
        J. Patrick McNichol, VSB #92699
        Matthew G. Rosendahl, VSB # 93738
        Kelly Guzzo, PLC
        3925 Chain Bridge Road, Suite 202
        Fairfax, VA 22030
        (703) 424-7572 – Telephone
        (703) 591-0167 – Facsimile
        Email: kkelly@kellyguzzo.com
        Email: aguzzo@kellyguzzo.com
        Email: casey@kellyguzzo.com
        Email: pat@kellyguzzo.com
        Email: matt@kellyguzzo.com

        *Counsel for Plaintiffs*